JOURNAL ENTRY AND OPINION
Defendant-appellant Delano Jackson appeals from his convictions following a jury trial for aggravated murder (R.C.2903.01) and attempted aggravated murder (R.C. 2923.02, 2903.01) of a second victim, both with firearm specifications. Defendant claims he was denied a fair trial and due process of law in fifteen separate assignments of error hereinafter set forth. We find no reversible error and affirm the judgment below.
On the evening of October 5, 1994, Christopher Campbell was the passenger in a car driven by Alzonia Murphy. They were on their way to visit Murphy's cousin, Channille Grice, at 11604 Durant Avenue in Cleveland. Upon arrival, they drove by the house once before pulling into the driveway because Mr. Murphy was unsure of her address. As they pulled into the driveway next to the house, Mr. Campbell was shot six times as he sat in the passenger side of the vehicle. Mr. Murphy was also shot once in the abdomen. Mr. Murphy immediately backed out of the driveway and drove toward Mt. Sinai Hospital as Mr. Campbell bled in the front seat of the car. Mr. Campbell died on the way to Mt. Sinai as the result of the six gun shot wounds.
Mr. Murphy's gunshot wound caused injuries to his intestines and leg and the bullet remains in his left leg. Because of the darkness and excitement of the moment, Mr. Murphy was unable to identify the shooter.
At the time of the murder, the defendant's girlfriend was Channille Grice, age 17. She testified that defendant (a.k.a. "Rick" or "Slick Rick") was abusive toward her and on occasion would blacken her eyes and bust her lip. The defendant was jealous of her and threatened to kill her if she ever left him. He also told her that if he ever caught her romantically involved with someone else he would kill her and that man as well.
On the afternoon of the killing, Ms. Grice testified that she left high school and met the defendant at the house of his best friend, Jameal Allen. The defendant asked her who had given her a ride to Jameal's house. Ms. Grice said she had ridden the bus. However, the defendant did not believe her, told her she was lying and slapped her. The defendant then took Ms. Grice home to 11604 Durant in a grey Monte Carlo.
When defendant and Ms. Grice arrived at her house, it was getting dark. They remained in the car arguing about his jealousy during which defendant again told her that he would kill her if she ever left him and would kill any man she would see. Before they got out of the car, the defendant showed Ms. Grice a firearm he stored in the back seat. She had seen the defendant fire the same firearm out of the window of his car on a prior occasion. She had also seen the same gun under defendant's mattress at his house. Ms. Grice identified State's Exhibit 49 as the same kind of weapon the defendant had shown her on October 5, 1994.
Ms. Grice testified that once they arrived at her home, defendant and Ms. Grice went inside and had sexual relations. Afterward, Ms. Grice escorted the defendant to his car and was standing near his car when the victims first drove by. She testified that defendant then reached into his car and armed himself with the gun. When the victims drove into the neighboring driveway, someone in the car yelled: "Hey girl, hey Channille." However, she could not see who was calling her from inside the car. The defendant then walked toward the victims' car and started shooting at them until the gun was empty. Ms. Grice testified that after he finished shooting, the defendant jumped into the grey Monte Carlo car and drove away alone.
Just before the defendant started shooting, Ms. Grice told Jamise Jones, Romale's girlfriend, to call 911, which Jamise did. On the 911 tape played at trial, Jamise asks "is someone shootin' at Rick?" with gunshots heard in the background.
Romale Grice, the twin brother of Ms. Grice, testified that he heard a commotion and came down to the front porch to see what was happening. Through the screen door, Romale saw the defendant shooting into the victims' car as the defendant walked toward it. Det. Gary Garisek later testified that he found four shell casings at the scene alongside the porch consistent with the defendant's movement towards the victims' car as he shot.
Demetrius Jones, a neighbor from across the street at 11605 Durant, testified and identified State's Exhibit 42 as a photograph of the grey Monte Carlo he saw leaving the scene that night after he heard gunshots and a scream. Theresa Washington, a friend of defendant, also testified and identified State's Exhibit 42 as a photograph of her grey Monte Carlo. She also testified that defendant was friends with her boyfriend, Jameal Allen, and defendant often had permission to drive her Monte Carlo.
According to Ms. Grice, shortly after defendant fled the scene, he called to ask her if she told the police that he was the shooter. She said that she did not tell the police anything. She did, however, tell the defendant that he had killed someone.
Ms. Grice further testified that when she was initially questioned on the night of the murder, she told the police the killer was a man named Damon Wheat. However, on the witness stand, Ms. Grice admitted she lied to the police about Wheat because she was scared and cared about the defendant. On October 12, 1994, she was confronted with information that she had lied and she finally told the truth to Det. Michael O'Malley of the homicide unit.
A short time later, Ms. Grice told the defendant that she had identified him as the shooter to the police. The defendant told her she had to "fix it." Soon thereafter, defendant took Ms. Grice to Gordon Park where he broke the murder weapon down into pieces and threw them into Lake Erie.
Det. O'Malley testified that he met with Ms. Grice on October 12, 1994. She told him that the defendant was the shooter who killed Christopher Campbell and that she was also still in love with the defendant at that time.
After throwing the weapon in the lake, the defendant went to Las Vegas. While there, he telephoned Ms. Grice and she told him that he had been charged with aggravated murder. Defendant later returned to the Cleveland area and was arrested on December 15, 1994 by the FBI Fugitive Task Force while lying in bed with Ms. Grice.
Defendant's trial was set for April 1995. However, prior to trial, defendant persuaded Ms. Grice not to cooperate with the prosecutor. Ms. Grice became "hard headed," was listening to the defendant and "didn't want nothing to happen to him" because she was still in love with him. Even after being placed in jail for three days as a material witness, Ms. Grice still refused to cooperate. As a result, defendant's case was dismissed.
On December 20, 1995, Det. O'Malley met again with Ms. Grice where she cooperated and again told him that defendant was the shooter. Subsequently, on January 13, 1996, Ms. Grice took Det. O'Malley to Gordon Park and showed him the exact spot where the defendant threw the pieces of the murder weapon into the lake. In July 1996, a diver from the Ports and Harbor Unit retrieved the upper receiver of an SWD Cobra M-11 pistol (State's Ex. 46) off Gordon Park. It was found right where Ms. Grice had stated it was thrown.
Special Agent Gregory Klees of the Bureau of Alcohol, Tobacco and Firearms testified as an expert in firearm tool marks. He testified that each individual firearm creates unique markings on the shell casings as they are ejected. Agent Klees testified that the four shell casings found at the murder scene matched State's Exhibit 46, the murder weapon.
On April 1, 1998, defendant was indicted for the aggravated murder of Christopher Campbell and the attempted murder of Alonzia Murphy. On October 14, 1998, the defendant was first tried but the jury was unable to reach a unanimous verdict.
The defendant was again tried on February 2, 1999 and that jury reached a unanimous verdict finding defendant guilty on all counts. Defendant was then sentenced to twenty-four years to life incarceration.
Defendant now brings this timely appeal.
We will address defendant's assignments of error in the order asserted and together where it is appropriate for discussion.
 I. DEFENDANT WAS DENIED A FAIR TRIAL BY REASON OF THE INTRODUCTION OF EVIDENCE OF OTHER ALLEGED BAD ACTS AND IMPROPER EVIDENCE.
In his first assignment of error, defendant asserts that the prosecution undertook to prove that he was allegedly a bad person through the use of "all sorts of irrelevant, immaterial and highly prejudicial testimony concerning defendant's alleged connection with guns." He further asserts that the evidence that he was a jealous and abusive boyfriend was also inadmissible "other bad acts" evidence. He claims that the cumulative effect of this evidence denied him a fair trial. We disagree.
The admission or exclusion of evidence lies within the trial court's sound discretion and will not be overturned absent an abuse of that discretion. State v. Combs (1991), 62 Ohio St.3d 278;State v. Sage (1987), 31 Ohio St.3d 173, paragraph two of the syllabus. The term "abuse of discretion" connotes more than an error of law or judgment, it implies that the court's attitude was unreasonable, arbitrary or unconscionable. Blakemore v. Blakemore
(1983), 5 Ohio St.3d 217, 219.
Defendant correctly asserts that it is well established that an accused cannot be convicted of one crime by proving that he has committed other crimes, or is a bad person. State v. Jamison
(1990), 49 Ohio St.3d 182. However, both the Rules of Evidence and the Ohio Revised Code set forth certain circumstances under which evidence of prior bad acts may be admissible at trial.
Evid.R. 404(B) provides:
 Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of fraud or accident.
R.C. 2945.59 similarly provides:
 In any criminal case in which the defendant's motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing an act is material, any acts of the defendant which tend to show his motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing the act in question may be proved, whether they are contemporaneous with or prior to subsequent thereto, notwithstanding that such proof may show or tend to show the commission of another crime by the defendant.
We find that the trial court did not abuse its discretion in admitting the above challenged evidence. The State offered evidence regarding defendant's convenient access to guns. However, this evidence was not being used to show that defendant was a bad person. Rather, the fact that defendant possessed firearms around the time of the murder showed that he had the opportunity to have access to a firearm on that day.
Defendant also claims that the trial court erroneously admitted testimony regarding his physical abuse of Ms. Grice and his jealousy toward her. Ms. Grice testified that defendant was jealous of her and repeatedly threatened to kill her if she ever left him. She further testified that he also told her that if he ever caught her romantically involved with someone else he would kill her and that man as well. We find that this evidence was relevant to establish defendant's motive in the shootings.
The evidence reflects that on the evening of the murder, defendant became jealous of Ms. Grice and slapped her. Later, they argued in the grey Monte Carlo about his jealousy when he again threatened to kill her if she ever left him for another man. Defendant then showed her a gun he had hidden in the back seat of the car. Shortly thereafter, the victims drove up and defendant pulled out the gun and opened fire on them.
Based on this testimony, we find that the evidence of defendant's jealousy was clearly relevant to show motive and intent for the shooting. Accordingly, it was admissible under Evid.R. 404(B) and the trial court did not abuse its discretion in admitting it.
Defendant also asserts that he was denied a fair trial by the trial court's admission of evidence regarding his involvement in other criminal activities, evidence regarding the anonymous letter and evidence regarding defendant being a fugitive. Defendant claims that the court wrongfully admitted extensive evidence concerning his involvement with Jameal Allen in a stolen car prior to Allen going to prison. He also claims that the prosecutor's statements regarding the anonymous letter sent to the police and the prosecutor's reference of defendant as a "fugitive" should not have been admitted.
We find that even assuming arguendo that the introduction of the above challenged evidence was error, any such error was harmless in light of the substantial evidence against defendant. Crim.R. 52(A) provides: "Any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded." "Where there is no reasonable probability that unlawful testimony contributed to a conviction, the error is harmless and therefore will not be grounds for reversal." State v.Brown (1992), 65 Ohio St.3d 483, 485, citing State v. Lytle (1976),48 Ohio St.2d 391. Error will not contribute to the defendant's conviction when the remaining, properly admitted evidence, standing alone, constitutes overwhelming proof of the defendant's guilt.State v. Williams (1988), 38 Ohio St.3d 346, 349-350; State v.Moreland (1990), 50 Ohio St.3d 58, 65; State v. Sage (1987),31 Ohio St.3d 173, 181.
At trial, Ms. Grice testified in depth about defendant's jealousy of her and his threats if she ever left him. She testified that they had an argument about his jealousy in his grey Monte Carlo on the afternoon of the killing during which he showed her his gun and threatened to kill her and any man she would date. Ms. Grice testified that later that night, she was standing next to defendant when the victims drove by but she could not identify who was in the car. When defendant saw the car pass by, he pulled out the gun from the back seat and started shooting at the car as he walked up to it. After he finished shooting, the defendant jumped into the grey Monte Carlo and drove away alone. This evidence was corroborated by Romale who testified that he saw the defendant shooting into the victims' car as the defendant walked toward it.
Ms. Grice further testified that defendant later took her to Gordon Park where he broke the murder weapon down into pieces and threw them into Lake Erie. She subsequently, met with Det. O'Malley and admitted that defendant was the shooter. She also took Det. O'Malley to Gordon Park and showed him the exact spot where the defendant threw the pieces of the murder weapon into the lake. A few months later, a part of an SWD Cobra M-11 pistol was found in that exact area which matched the four shell casings found at the murder scene.
We find that any error in the admittance of the above evidence was harmless as such evidence did not contribute to the defendant's conviction. There was significant other admissible evidence which was overwhelming proof that defendant shot the victims in a jealous rage. Accordingly, the trial court's admission of this evidence was not unreasonable, arbitrary or unconscionable to constitute an abuse of discretion and the defendant was not denied a fair trial.
Assignment of Error I is overruled.
 II. DEFENDANT WAS DENIED A FAIR TRIAL WHEN THE PROSECUTOR WAS PERMITTED TO QUESTION VERONICA SAWYER AND NO LIMITING INSTRUCTION WAS GIVEN.
Defendant asserts that the State improperly questioned Veronica Sawyer and Patricia Koch Windham and that such testimony denied him a fair trial. We disagree. Veronica Sawyer testified that she gave a written statement to the Cleveland Police on August 7, 1997, in which she told the police that the defendant confessed to this murder, stating: "if he hadn't run out of bullets, the other nigger would have been dead, too." Her personal attorney, Patricia Koch Windham, was with Ms. Sawyer when she gave her statement and, in fact, signed the statement as a witness to Ms. Sawyer's signature. Ms. Sawyer also testified to the same effect before the Grand Jury.
At trial, upon cross-examination by defense counsel, Ms. Sawyer testified the defendant did not confess to her. She claimed that she lied in the previous statements because she was threatened by the police.
Attorney Windham testified she accompanied Ms. Sawyer to the Cleveland Police Homicide Unit in order that Ms. Sawyer could give a voluntary, written statement regarding the defendant's involvement in a homicide. Ms. Windham testified that her client was not threatened by Det. O'Malley who acted like a "perfect gentleman." Ms. Sawyer never indicated to Ms. Windham that she was going to lie to police. Ms. Windham further testified that she had no reason to believe that Ms. Sawyer was untruthful with the police.
It is well established that the weight given to the testimony and the credibility of the witnesses is within the province of the trier of fact. State v. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus. Given the prior sworn statements and the conflicting trial testimony, it was for the jury to determine the veracity of Ms. Sawyer's and Ms. Windham's testimony.
Defendant asserts that Ms. Windham's testimony was in violation of the attorney-client privilege. The attorney-client privilege bestows upon the client the power to refuse to disclose, and to prevent others from disclosing, confidential communications made between the attorney and client in the course of seeking or rendering legal advice. State ex rel. Thomas v. Ohio State Univ.
(1994), 71 Ohio St.3d 245, 249. The only material protected by the attorney-client privilege are those involving communications between attorney and client. Id.
In the instant case, the trial court called Ms. Windham as a witness immediately after Ms. Sawyer's testimony. Pursuant to Evid.R. 614(A), "[t]he court may, on its own motion or at the suggestion of a party, call witnesses, and all parties are entitled to cross-examine witnesses thus called." The record reflects that both the State and defense were given a full opportunity to cross-examine Ms. Windham. We also find that Ms. Windham's testimony regarding the circumstances surrounding Ms. Sawyer at the time of her August 7, 1997 written statement was not protected under the attorney-client privilege. Ms. Windham merely testified that no threats were communicated to Ms. Sawyer. She also testified that Ms. Sawyer never indicated to her that she was lying and that she did not have any reason to believe that Ms. Sawyer was not telling the truth in her statement. This testimony merely expressed her own observations of the written statement and did not involve privileged communications between her and Ms. Sawyer.
Furthermore, as discussed in response to Assignment of Error No. I, considering the overwhelming other evidence of defendant's guilt, any errors regarding the testimony of Ms. Sawyer or Ms. Windham were harmless. This evidence was not significant and did not contribute to the defendant's conviction. Defendant was not denied a fair trial by the trial court's admission of this testimony.
Assignment of Error II is overruled.
 III. DEFENDANT WAS DENIED A FAIR TRIAL WHEN WITNESSES WERE PERMITTED TO TESTIFY AS TO THE VERACITY OF A WITNESS.
Defendant asserts that the trial court erroneously permitted witnesses Det. O'Malley and Ms. Windham to testify to the credibility of other witnesses. He asserts that the truth or veracity of witnesses should be left for the jury and that this testimony denied him a fair trial.
Defendant correctly asserts that the credibility of witnesses is exclusively for the trier of fact. However, the record reflects that defense counsel first questioned Det. O'Malley on cross-examination regarding his "concerns" about the veracity of Ms. Grice's statements to him. The State immediately objected and a side bar was had. During the side bar, the State expressed that if the defense was going to ask about Det. O'Malley's suspicions, it too should be permitted to ask him "do you believe her?" The trial court found that the defense had "opened the door" to this type of questioning.
Defendant now complains that the prosecutor improperly questioned Det. O'Malley. Once defense counsel questioned defendant about Det. O'Malley's "concerns," the trial court correctly found that this "opened the door" to the prosecutor for similar questioning on cross-examination. It is well settled that "[a] party will not be permitted to take advantage of an error which he himself invited or induced." Hal Artz Lincoln-Mercury,Inc. v. Ford Motor Co. (1986), 28 Ohio St.3d 20. We further find that any error regarding the admission of this testimony constitutes harmless error and clearly did not deprive defendant of a fair trial.
Assignment of Error III is overruled.
 IV. DEFENDANT WAS DENIED A FAIR TRIAL WHEN THE PROSECUTOR BROUGHT BEFORE THE JURY THE RESULT OF A POLICE INVESTIGATION.
Defendant asserts that he was denied a fair trial because the trial court allowed the prosecutor to elicit inadmissible evidence from F.B.I Special Agent Douglas Williams and Det. O'Malley. Defendant asserts that this testimony was based upon hearsay and therefore, it was inadmissible.
Statements offered to explain a police officer's conduct while investigating a crime are not hearsay. State v. Price (1992),80 Ohio App.3d 108, 110. As such, these statements are not offered for their truth, but as an explanation of the process of investigation. State v. Braxton (1995), 102 Ohio App.3d 28, 49.
Agent Williams testified as to what efforts he made in apprehending the defendant who was wanted in this homicide investigation. He testified that he interviewed associates, girlfriends and relatives of defendant, and Det. O'Malley. Agent Williams never testified as to what anyone told him, only what he learned as a result of his investigation and what he did to apprehend the defendant who was arrested on December 15, 1994 on a fugitive warrant more than two months after the homicide.
Det. O'Malley also testified as to his duties and what he did in this investigation. He testified that Ms. Grice identified the defendant as the shooter on December 20, 1995. She took him to Gordon Park on January 13, 1996 to show him where the defendant threw the murder weapon. Det. O'Malley further testified Romale Grice identified the murderer in his written statement. Romale himself also testified regarding this.
We find that the testimony of Agent Williams and Det. O'Malley was offered for the purpose of explaining the process of investigation that lead to the identification and apprehension of the defendant. Because these statements were not offered for their truth, but merely to explain the investigative process, they are not hearsay and were properly admitted.
Assignment of Error No. IV is overruled.
 V. DEFENDANT WAS DENIED A FAIR JURY WHEN PEREMPTORY CHALLENGES WERE USED AGAINST BLACK JURORS.
Defendant asserts that the prosecution unconstitutionally exercised its peremptory challenges to eliminate an African-American juror on the basis of race in violation of Batson v.Kentucky (1986), 476 U.S. 79, 90 L.Ed.2d 69, 106 S.Ct. 1712. This assertion is unsupported by the record.
Under Batson, the State may not use its peremptory challenges, during the jury selection process, to exclude a member of the venire solely on the basis of race or gender. To establish a primafacie case of purposeful discrimination, a defendant must establish: "(1) that members of a cognizable racial group were peremptorily challenged, and (2) that the facts and any other relevant circumstances raise an inference that the prosecutor used the peremptory challenges to exclude jurors on account of their race." State v. Raglin (1998) 83 Ohio St.3d 253, 265, citing Statev. Hill (1995), 73 Ohio St.3d 433. If the prima facie case is shown, the burden then shifts to the prosecution to articulate a race-neutral explanation for the challenge. Id. If such race-neutral reasons are offered, the burden shifts back to the defendant to establish that the reasons advanced by the prosecution are pretextual. State v. Hernandez (1992), 63 Ohio St.3d 577, 582. A race-neutral explanation offered by the prosecution need not rise to the level of a challenge for cause. State v. Cook (1992),65 Ohio St.3d 516.
Based on the record before us, we find nothing to support an inference that the State improperly used its peremptory challenges to exclude jurors based solely on race. Out of the twenty-five people on the jury panel, only three were African-American. The State used its peremptory challenges to excuse two of them. The defense immediately objected to the second and argued that the challenges were based on race. However, the record reflects that the State expressed to the court that it excused the first African-American juror because she had a son who was charged with felonious assault and the State was concerned about her bias. The State also expressed to the court that it excused the second African-American juror because he "was falling asleep during the jury questioning on multiple occasions." The trial court held "that the State has given a reason for the exclusion, exceptions to the defense. Mrs. Wilkins will be excused under their last peremptory." We agree that the defendant has failed to establish the State's improper use of peremptory challenges based on race and that the State clearly gave a sufficient race-neutral explanation for the challenges that was not pretextual.
Assignment of Error V is overruled.
 VI. DEFENDANT WAS DENIED HIS CONSTITUTIONAL RIGHT TO PRESENT A DEFENSE WHEN THE COURT WOULD NOT ALLOW TESTIMONY FROM JAMES KERSEY AND DONALD TITTLE.
Defendant asserts that he was prejudiced by the trial court's refusal to allow him to offer the testimony of his previous attorneys James Kersey and Donald Tittle. He asserts that their testimony would have established that Ms. Grice told them she lied and made up the statement that defendant was involved in the shooting. He asserts that such conflicting statements made to his prior attorneys would have aided his defense.
As stated above, the admission or exclusion of evidence is within the discretion of the trial court and will not be reversed unless the trial court's decision was unreasonable, arbitrary or unconscionable. In the instant case, Ms. Grice openly and repeatedly admitted during her testimony at trial that she had lied to the police and the investigator. She repeatedly testified that she lied and failed to cooperate because she was still in love with defendant and did not want anything to happen to him.
We find that the testimony of Mr. Kersey and Mr. Tittle would have provided nothing to impeach Ms. Grice. She openly admitted on the stand that she lied to protect the defendant. Testimony from Mr. Kersey and Mr. Tittle regarding her admission to them that she lied would have added nothing that Ms. Grice did not offer herself. Therefore, the trial court's refusal to admit such cumulative evidence was not unreasonable, arbitrary or unconscionable to constitute an abuse of its discretion.
Assignment of Error VI is overruled.
 VII. DEFENDANT WAS DENIED HIS CONSTITUTIONAL RIGHT TO PRESENT A DEFENSE WHEN THE COURT WOULD NOT ALLOW A READING OF TESTIMONY OF A WITNESS GIVEN AT A PRIOR TRIAL WHEN THE WITNESS WAS UNAVAILABLE.
Defendant asserts that the trial court should have permitted him to read to the jury the testimony of Bernard Taggard from defendant's first trial. Defendant asserts that Mr. Taggard could not be located and was unavailable to testify and therefore, his prior testimony is admissible under Evid.R. 804(B)(1).
We find that defendant failed to sufficiently convince the trial court that Mr. Taggard was unavailable pursuant to Evid.R. 804. In fact, the defense admitted that the witness had not even been served with a subpoena to attend the trial. (Tr. at 1406).
Evid.R. 804(A) defines "unavailability as a witness" to include only five situations in which the declarant:
(1) is exempted by ruling of the court * * *;
(2) persists in refusing to testify;
(3) testifies as to a lack of memory;
 (4) is unable to be present * * * because of death * * * or illness;
 (5) is absent from the hearing and the proponent of the declarant's statement has been unable to procure the declarant's attendance * * * by process or other reasonable means.
"A showing of unavailability * * * must be based on testimony of witnesses rather than hearsay not under oath * * *." State v.Keairns (1984), 9 Ohio St.3d 228. The defendant did not offer such testimony to establish the unavailability of this witness. The defendant admitted at trial that he had not even served the witness with a subpoena to attend the trial. There is no statement or proffer to indicate that any good faith attempt was made to locate this witness. Contrary to defendant's claim, Evid.R. 804(B) applies only when the declarant is unavailable. Therefore, because the defendant has failed to establish that Mr. Taggard was unavailable, the trial court did not abuse its discretion in excluding his prior testimony.
Assignment of Error VII is overruled.
 VIII. DEFENDANT WAS DENIED A FAIR TRIAL WHEN THE DEFENSE WAS AMBUSHED BY THE PRODUCTION OF A TAPE RECORDING WHICH HAD NOT BEEN DISCLOSED DURING DISCOVERY.
Defendant assert that he was denied a fair trial when the trial court admitted, over objection, the tape recording of the 911 call. He asserts that the State failed to timely produce the tape in violation of Crim.R. 16.
Crim.R. 16(D) states:
 If, subsequent to compliance with a request or order pursuant to this rule, and prior to or during trial, a party discovers additional matter which would have been subject to discovery or inspection under the original request or order, he shall promptly make such matter available for discovery or inspection, or notify the other party or his attorney or the court of the existence of the additional matter, in order to allow the court to modify its previous order, or to allow the other party to make an appropriate request for additional discovery or inspection.
In the instant case, the record is clear that the State discovered the 911 tape during the course of trial. (Tr. at 1192-94). The existence of this tape was made known to defense counsel immediately after it was discovered. Det. O'Malley testified that he "was finally able to retrieve" the tape the day before he testified. (Tr. at 1287). The record reflects that there was no laxity on the part of the prosecution in producing this 911 tape as the defendant alleges. When the tape was found, the defense was informed by the prosecution.
As discussed above, the trial court has broad discretion in the admission and exclusion of evidence and absent a clear abuse of discretion, this Court will not disturb the trial court's decision. The trial court ruled the 911 tape was relevant and it did not abuse its discretion in allowing it into evidence. The tape was played during the testimony of Jamise Jones. Ms. Jones was the person who placed the 911 call and whose voice is heard on the tape. The defense had a full opportunity to cross-examine her about the tape. Accordingly, the defense has failed to establish how it was unduly prejudiced by the admission of the 911 tape.
Assignment of Error VIII is overruled.
 IX. DEFENDANT WAS DENIED A FAIR TRIAL WHEN THE PROSECUTOR COMMENTED ON DEFENDANT'S NOT TESTIFYING AND PRODUCING ANY EVIDENCE.
 X. DEFENDANT WAS DENIED A FAIR TRIAL BY REASON OF PROSECUTORIAL ARGUMENT.
Defendant asserts that the prosecutor improperly commented during closing argument on defendant's failure to testify and his failure to produce evidence. He asserts that these comments denied him a fair trial.
Defendant specifically points out the prosecutor's alleged improper comments as follows:
 No testimony about where he was. He's the only one here without any testimony where he was, no alibi, no witnesses.
(Tr. at 1524). The prosecutor also stated:
 Lastly, the most important thing he said, that the defendant was not at the house at the time of the murder. You haven't heard any evidence where he was, have you? Just their supposition that he wasn't there at the time of the murder. No alibi, no walking through these doors here, nothing like that.
(Tr. at 1513-1514). However, the prosecutor went on to state:
 What you have, ladies and gentlemen, is all sorts of evidence that we have to put on throughout this trial, to show you that what they were telling you made no sense. It's absurd that Romale is your killer. They tried to tell you that he already left in his car.
(Tr. at 1514)
Generally, conduct of a prosecuting attorney at trial shall not be grounds for reversal unless the conduct deprives the defendant of a fair trial. Recently, this Court in State v.Chisholm (Oct. 14, 1999), Cuyahoga App. No. 74923, unreported, set forth the proper inquiry regarding prosecutorial misconduct as follows:
 Generally, conduct of a prosecuting attorney at trial shall not be grounds for reversal unless the conduct deprives the defendant of a fair trial. State v. Apanovich (1987), 33 Ohio St.3d 19, 24; State v. Papp (1978), 64 Ohio App.2d 203, 211. An appellant is entitled to a new trial only when a prosecutor asks improper questions or makes improper remarks and those questions or remarks substantially prejudiced appellant. State v. Smith (1984). 14 Ohio St.3d 13, 14. A prosecutor is afforded wide latitude in closing arguments. State v. Jacks (1989), 63 Ohio App.3d 200, 210. In analyzing whether an appellant was deprived of a fair trial, this Court must determine whether, absent the improper questions or remarks, the jury would have found the defendant guilty. State v. Maurer (1984), 15 Ohio St.3d 239, 266; State v. Dixon (Mar. 13, 1997), Cuyahoga App. No. 68338, unreported. The touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor. Smith v. Phillips (1982), 455 U.S. 209. 219. In addition, should a defendant fail to object to the prosecutor's allegedly improper comments at trial pursuant to Crim.R. 52(B), the comments must rise to the level of plain error affecting the substantial rights of the defendant before this Court can take notice of the error. State v. Wogenstahl
(1996), 75 Ohio St.3d 344, 357. Under a plain error analysis, reversal of a conviction is appropriate only if it can be said that, but for the alleged error, the result of the trial would clearly have been different. State v. Gumm (1995), 73 Ohio St.3d 413, 428; State v. Parker (Oct. 5, 1995), Cuyahoga App. No. 68156, unreported.
It is well established that both parties, including the prosecutor, are afforded wide latitude in closing arguments. Statev. Frazier (1995), 73 Ohio St.3d 323, 341; State v. Loza (1994),71 Ohio St.3d 61, 78; State v. Jacks (1989), 63 Ohio App.3d 200, 210. It is not improper for the prosecution, in closing, to point out the lack of evidence supporting the defense theory of the case.State v. Williams (1986), 23 Ohio St.3d 16, 20. "[I]n the tension and turmoil of a trial, both the prosecution and the defense have wide latitude in summation as to what the evidence has shown and what reasonable inferences may be drawn therefrom." State v. Lott
(1990), 51 Ohio St.3d 160, 165, quoting State v. Stephens (1970),24 Ohio St.2d 76, 82.
In the instant case, we find that the above comments were not improper remarks regarding defendant's failure to testify or present evidence. Rather, the prosecutor, in closing argument, was attempting to rebut the theory by defense counsel that the defendant was already gone when the murder occurred, by focusing the jury on the court's instruction to listen to the evidence and not what the lawyers argue. Throughout the trial, defense claimed defendant was not present at the time of the murder. In his opening statement, defense counsel stated the defendant had already left in his Monte Carlo and that Romale Grice was the shooter. Also, during cross-examination of various witnesses and during closing argument, the defense claimed the defendant had already left, that Romale was the killer, and that the State witnesses were lying.
In rebuttal, the prosecutor focused the jury on the fact that the witnesses who testified said the defendant was there, directly contradicting the defense theory. Presenting a summation of what the evidence has shown is a proper argument.
The record reflects that there were no witnesses, no evidence, and no testimony that the defendant was not present during the murder. The prosecutor pointed out there were two eyewitnesses to the defendant being the murderer and that no one testified that Romale was the murderer. The prosecutor also pointed out the evidence that an independent witness saw a grey Monte Carlo leaving the scene immediately after the shots were fired and that the defendant drives that type of car. In presenting this evidence, the prosecutor was attempting to assert that no witnesses had testified that defendant was anywhere else but at the scene.
We find that the prosecutor was not commenting improperly. A thorough reading of the argument explains the intent of the prosecutor's argument was to focus the jury on the State witnesses that actually testified and who all placed the defendant at the murder scene. Demetrius Jones testified he saw defendant's Monte Carlo leave immediately after the shooting. The 911 tape with contemporaneous comments about "Rick" (a.k.a. the defendant), also reveals he was at the scene during the shooting. All of this evidence was in direct contradiction to the defense attorney's theory. The prosecutor was not commenting on the defendant's failure to testify, but the lack of any testimony that he was not at the scene of the shooting.
Defendant also claims that the prosecutor erroneously stated that defendant had fled the jurisdiction to avoid prosecution. However, the testimony presented at trial established that defendant fled to Las Vegas immediately after the murder where his father or step-father lives. Defendant was subsequently captured at his grandmother's house with Ms. Grice over two months after promising and failing to turn himself in to the police. Flight has repeatedly been held to be evidence of consciousness of guilt.State v. Williams (1997), 79 Ohio St.3d 1, 11; State v. Taylor
(1997), 78 Ohio St.3d 15, 27; State v. Nelson (Feb. 25, 1999), Cuyahoga App. No. 73289, unreported; State v. Chapman (July 2, 1998), Cuyahoga App. No. 72532, unreported.
The defendant also asserts that the prosecutor improperly stated: "You are going to find the defendant guilty * * * because he is," that the prosecutor improperly stated that "just because a witness lied, no murderer would be convicted" and improperly explained why the State had to give Veronica Sawyer immunity. However, defendant failed to object to any of these comments at the time they were made. Therefore, in order to warrant reversal of his conviction, defendant must establish that, but for the alleged improper comments, the result of the trial would clearly have been different. Because defendant cannot meet this burden, no plain error exists to warrant reversal of his conviction.
Assignments of Error IX and X are overruled.
 XI. DEFENDANT WAS DENIED DUE PROCESS OF LAW WHEN THE COURT ALLOWED AN AMENDMENT TO THE FIREARM SPECIFICATION.
In this assignment of error, defendant asserts that the trial court erroneously allowed the State to amend defendant's indictment. Defendant's original indictment contained two firearm specifications (R.C. 2941.141 and 2941.145). The State, over objection, subsequently amended the indictment to include a firearm specification under R.C. 2929.71.
Defendant is basically claiming that the State failed to indict him under the correct code section and that he was denied due process by the error. However, the Ohio Supreme Court has held that the State may amend an indictment provided that the identity of the crime charged does not change. State v. O'Brien (1987),30 Ohio St.3d 122, 125, 126. In O'Brien, the Court reasoned that the accused should not be "misled or prejudiced by the omission of such element from the indictment." Id. at 128.
Crim.R. 7(D) provides:
 * * * The court may at any time before, during, or after a trial amend the indictment * * * in respect to any defect, imperfection or omission in form or substance, or of any variance with the evidence, provided no change is made in the name or identity of the crime charged * * *.
The court did not abuse its discretion in amending the indictment as aforesaid.
Assignment of Error XI is overruled.
 XII. DEFENDANT WAS DENIED DUE PROCESS OF LAW WHEN THE COURT AMENDED THE STATUTE AND THE INDICTMENT WHEN IT INCLUDED A FAILURE TO ACT.
Defendant now asserts that his indictment alleged that he "caused the death of * * * Christopher Campbell" but the trial court instructed the jury that: "The State charges that the act of or failure to act by the defendant caused the death of Christopher Campbell * * *." Defendant asserts that the inclusion of "act or failure to act" constituted a constructive amendment of the indictment and deprived him of his right to due process.
We find that the record reflects that defendant did not object to this instruction and therefore, he has waived all but plain error. "Failure to object to a jury instruction constitutes a waiver of any claim of error relative thereto, unless, but for the error, the outcome of the trial clearly would have been otherwise."State v. Underwood (1983), 3 Ohio St.3d 12, syllabus; State v. Long
(1978), 53 Ohio St.2d 91. In State v. Williford (1990), 49 Ohio St.3d 247,251, the Supreme Court found that "[w]e have repeatedly held that a failure to object before the jury retires in accordance with the second paragraph of Crim.R. 30(A), absent plain error, constitutes a waiver." The second paragraph of Crim.R. 30(A) states in pertinent part:
 On appeal, a party may not assign as error the giving or the failure to give any instructions unless the party objects before the jury retires to consider its verdict, stating specifically the matter objected to and the grounds of the objection. Opportunity shall be given to make the objection out of the hearing of the jury.
The evidence and arguments at trial clearly established that defendant was charged with causing the death of Mr. Campbell. Regardless of this alleged error, the jury found that defendant's "act" of shooting Mr. Campbell caused his death. Accordingly, defendant cannot establish that "but for" the inclusion of "act or failure to act" in the instruction, he would not have been convicted.
Assignment of Error XII is overruled.
 XIII. DEFENDANT WAS DENIED DUE PROCESS OF LAW WHEN THE COURT INSTRUCTED UPON TRANSFERRED INTENT RESULTING FROM AN ACCIDENTAL SHOOTING.
Defendant asserts that the trial court erroneously instructed the jury on transferred intent. Defendant claims that this also constituted a constructive amendment of his indictment and denied him due process. We disagree.
The trial court instructed the jury as follows:
 If you find the defendant did have a purpose to cause the death of a particular person, the shot accidentally caused the death of another person, then the defendant would be just as guilty as if the shot had taken effect upon the person intended. The purpose required is to cause the death of another, not any specific person. If the shot missed the person intended, but caused the death of another, the element of purpose remains and the offense is as complete as though the person for whom the shot was intended and died. However, if there was no purpose to cause the death of anyone, the defendant cannot be found guilty of attempted aggravated murder.
(Tr. at 1556-1557)
Again, defendant failed to timely object to this instruction. Thus, he waived all but plain error. We find that no plain error existed as defendant cannot show that he was prejudiced by this instruction. The evidence presented at trial established that shortly after defendant threatened to kill Ms. Grice and any man she would leave him for, defendant opened fire on the car occupied by Christopher Campbell and Alonzia Murphy. As a result of the attack, Mr. Campbell was killed and Mr. Murphy was seriously injured. The instruction given by the trial court merely informed the jury that if the defendant intended to kill when he pulled the trigger, it did not matter whether he killed the intended target or an innocent bystander. Based on this evidence, an instruction on transferred intent was supported by the evidence in this case. Accordingly, no plain error exists.
Assignment of Error XIII is overruled.
 XIV. DEFENDANT WAS DENIED DUE PROCESS OF LAW WHEN IMPROPER JURY INSTRUCTIONS WERE GIVEN.
In this assignment of error, defendant asserts that he was denied due process because "[a] number of improper jury instructions were given which eliminated the requirement of proof of the elements of the offense." Specifically, the defendant asserts that the court erroneously instructed the jury regarding the element of "purpose" and that the trial court unconstitutionally mandated a presumption of purpose if a dangerous weapon is used.
The trial court's "purpose" instruction was as follows:
 Purpose with prior calculation and design to cause the death of another is an essential element of the crime of aggravated murder. A person acts purposely when it is his specific intention to cause a certain result.
 It must be established in this case that at the time in question, there was present in the mind of the defendant a specific intention to purposely, with prior calculation and design, cause the death of another, to-wit, Christopher Campbell.
 When the gist of the offense is a prohibition against conduct of a certain nature, a person acts purposely if his specific intention was to engage in conduct of that nature regardless of what he may have intended to accomplish by his conduct.
 Purpose is a decision of the mind to do an act with the conscious objective of producing a specific result or engaging in specific conduct. To do an act purposely is to do it intentionally and not accidentally. Purpose and intent mean the same thing. The purpose with which a person does an act or brings about a result is known only to himself, unless he expresses it to others or indicates it by his conduct.
 The purpose with which a person does an act or brings about a result is determined from the manner in which it is done, the means or weapon used, and all other facts and circumstances in evidence.
 If a wound is inflicted upon a person with a deadly weapon in a manner calculated to destroy life or inflict great bodily harm, the purpose to cause the death may be inferred from the use of the weapon.
(Tr. at 1543-1544)
Because defendant again failed to object to these instructions, he has waived all but plain error. The above recitation of the "purpose" instruction was read exactly as set forth in 4 Ohio Jury Instructions (1997), Section 409.01.
In examining the trial court's jury instructions, we do not review portions of those instructions in isolation, rather we review the court's charge as a whole in determining whether the jury was properly instructed. State v. Burchfield (1993), 66 Ohio St.3d 261,262. It is clear that the trial court correctly read the specific intent instruction, the purpose instruction and the dangerous weapon instruction. The instruction was not confusing and accurately set forth the applicable law. Contrary to defendant's claim, the "purpose" instruction did not diminish the requirement of proving specific intent as the instruction clearly stated: "It must be established in this case that at the time in question, there was present in the mind of the defendant a specific intention to purposely, with prior calculation and design, cause the death of another, to-wit, Christopher Campbell." The above instruction also did not create an unconstitutional mandatory presumption of purpose if a dangerous weapon is used as defendant claims. The instruction given by the trial court accurately set forth that purpose can be inferred if a wound is inflicted upon a person with a deadly weapon in a manner calculated to destroy life or inflict great bodily harm. Accordingly, we find that the trial court correctly and accurately charged the jury on the law. There was no plain error which would justify overturning this jury verdict.
Assignment of Error XIV is overruled.
 XV. DEFENDANT WAS DENIED DUE PROCESS OF LAW WHEN HIS MOTIONS FOR JUDGMENT OF ACQUITTAL WERE OVERRULED.
In his last assignment of error, defendant asserts that the evidence presented at trial does not support his conviction beyond a reasonable doubt and therefore, his Crim.R. 29(A) motions for acquittal should have been granted. This assertion is unsupported by the record.
Crim.R. 29(A) provides that a trial court "shall order the entry of a judgment of acquittal * * * if the evidence is insufficient to sustain a conviction of such offense or offenses." A trial court may not grant an acquittal by authority of Crim.R. 29(A) if the record demonstrates that reasonable minds can reach different conclusions as to whether each material element of a crime has been proved beyond a reasonable doubt. See State v.Wolfe (1988), 51 Ohio App.3d 215, 216. In making this determination, all evidence must be construed in a light most favorable to the prosecution. See Id.
An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The standard of review with regard to the sufficiency of evidence was recently summarized by the Supreme Court in State v. Smith (1997), 80 Ohio St.3d 89, 113, as follows:
 Sufficiency of the evidence is the legal standard applied to determine whether the case may go to the jury or whether the evidence is legally sufficient as a matter of law to support the jury verdict, State v. Thompkins (1997), 78 Ohio St.3d 380, 386, 678 N.E.2d 541, 546, whereas the "[w]eight of the evidence concerns `the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other.'" (Emphasis sic.) Id. at 387, 678 N.E.2d at 546.
 In reviewing the record for sufficiency, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." State v. Jenks (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus, following Jackson v. Virginia (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560. * * *
Defendant asserts that there was insufficient evidence to support his convictions because they were based on testimony from witnesses, specifically Ms. Grice, who admittedly lied on prior occasions in this case. We disagree.
The evidence reflects that two eyewitnesses, Ms. Grice and Romale, testified that they saw the defendant shoot the victims. Ms. Grice testified that defendant was extremely jealous of her and repeatedly threatened to kill her if she ever left him and any man that she became romantically involved with. Earlier on the day of the shootings, defendant showed Ms. Grice a firearm he stored in the back seat of his Monte Carlo. She recognized this weapon as she had previously seen it in defendant's possession on multiple occasions. Ms. Grice was present when defendant threw the gun into Lake Erie and assisted the police in recovering it. Ms. Grice later identified the retrieved gun (State's Ex. 49) as the same weapon the defendant showed her on the day of the shootings and it was determined to be the murder weapon after it matched four shell casings found at the murder scene.
Defendant's presence at the scene was corroborated by the testimony of several other witnesses. Theresa Washington testified that she was the owner of the grey Monte Carlo and that defendant often had permission to drive the car. Demetrius Jones, a neighbor, testified that he saw a grey Monte Carlo speed away immediately after he heard the gun shots. Furthermore, Jamise Jones' statement on the 911 tape asking "is someone shootin' at Rick?" with gunshots in the background also established defendant's presence at the murder scene.
In addition, Ms. Grice openly admitted at trial that at the time of her prior statements, she still loved the defendant and lied to protect him. The defense fully cross-examined the State's witnesses and explored its theory that Romale was the real killer. The weight given to the testimony of all of these witnesses and their credibility were within the province of the trier of fact.
Considering these facts in a light most favorable to the prosecution, it was reasonable for a trier of fact to conclude that during a jealous rage, defendant retrieved his gun from the back seat of his car and opened fire on the victims' car after it pulled into a neighboring drive way and called out to defendant's girlfriend. As a result, Mr. Campbell was killed and Mr. Murphy was seriously wounded. We find that there was sufficient evidence presented at trial to establish the requisite elements of aggravated murder and attempted aggravated murder beyond a reasonable doubt. Therefore, the trial court properly overruled defendant's Crim.R. 29(A) motion for acquittal.
Assignment of Error XV is overruled.
Judgment affirmed.
It is ordered that appellee recover of appellant its costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Court of Common Pleas to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
 PATTON, P.J. and SPELLACY. J., CONCUR.
________________________ JAMES M. PORTER, JUDGE